UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER YATES,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>DAVID B. ADAMS, et al.,<br><br>　　　　　Defendants. | Case No. 15-cv-04912-JD<br><br>**ORDER RE SUMMARY JUDGMENT**<br>Re: Dkt. No. 61 |

　　　　In this copyright infringement action filed by plaintiff Peter Yates, all defendants have collectively moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 61.  The Court grants the motion.

**BACKGROUND**

　　　　Plaintiff Yates is a software developer.  His complaint, which alleges a single claim for copyright infringement, names as a defendant David Adams, individually and doing business as Transmedia, Inc., Transmedia Post Production, Transmedia Radio Networks, Mediafax, Inc., and Spottraffic, Inc.  Dkt. No. 44 ¶ 1.  Other defendants named by the complaint are television station and media companies:  Nexstar Broadcasting Group, Inc., Seal Rock Broadcasters, LLC, Sarkes Tarzian, Inc., Gray Television, Inc., Sinclair Broadcast Group, Inc., Intermountain West Communications Company, Inc., and Comcast Corporation.  *Id*. ¶¶ 2-10.

　　　　Yates worked for Adams and his company, Transmedia, Inc. ("Transmedia"), as an independent contractor from 2001 until 2009.  Dkt. No. 62 at 2-3, 5; Dkt. No. 65 at 6.  Between 2001 and 2003, Yates created the software that is the subject of this litigation.  Dkt. No. 65 at 6. The software relates to managing advertising traffic for television stations, and Adams hired Yates to write a program that would allow Transmedia's clients (which encompasses all defendants other

1    than Adams) to "digitally download ads from Transmedia's server over the Internet for subsequent
2    on-air broadcast." Dkt. No. 62 at 1.

3    Yates alleges that he "registered the copyright of his software" on March 18, 2013. Dkt.
4    No. 44 ¶ 18. He claims that defendants reproduced, distributed and/or prepared derivative works
5    of and from the software he created from May 2003 through at least January 2014; that defendants
6    did not have authorization to do so; and that these acts of the defendants constituted copyright
7    infringement. *Id*. ¶¶ 19-23.

## DISCUSSION

Summary judgment is appropriate when the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are facts that may affect the outcome of the case, and a dispute over a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine if there is a genuine dispute as to any material fact, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in that party's favor. *Id*. at 255. The Court need not, however, "scour the record in search of a genuine issue of triable fact," and it is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quotations omitted).

Yates' single claim in this lawsuit is for copyright infringement, Dkt. No. 44 ¶¶ 14-23, the elements of which are "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Defendants here assert that they are entitled to summary judgment because they had an implied license for the software at issue, the existence of which creates an affirmative defense to a copyright infringement claim. *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000). Although exclusive licenses must be granted in writing, nonexclusive licenses can be granted orally or by implication. *Asset Marketing Sys., Inc. v. Gagnon*, 542 F.3d 748, 754 (9th Cir. 2008). Our circuit has held that an implied, nonexclusive license is granted for

computer programs when the following conditions are met:  (1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute -- or use, retain and modify -- the computer program at issue.  *Id*. at 754-55.

Significantly, Yates concedes the first two prongs of the implied license test, thereby removing any possibility of a genuine dispute of material fact as to those issues.  *See* Dkt. No. 65 at 10 ("While plaintiff created the software and delivered it to defendants, the third prong of intent fails").  The focus of the summary judgment dispute is consequently on the third prong:  whether or not Yates intended that defendants copy and distribute, or use, retain and modify, the software that Yates created.

Our circuit has stated that the relevant intent here is "the licensor's objective intent at the time of the creation and delivery of the software as manifested by the parties' conduct."  *Asset Marketing*, 542 F.3d at 756.  The Court is to consider the following factors in determining that intent:  "(1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts . . . providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible."  *Id*. (internal quotations omitted).

The detailed declaration by David Adams supports the finding of an implied license under these factors.  Adams hired Yates for his software coding services in the summer of 2001.  Dkt. No. 62-1 (Adams Decl.) ¶ 8.  Yates was brought in as a contractor, and he and Adams agreed on an hourly rate that Yates would be paid.  *Id*.  Because Yates had a preexisting relationship with another Transmedia employee, "no formal written agreement was entered into."  *Id*. ¶ 9.  Yates instead worked off of a "verbal outline" given to him of Transmedia's functionality needs, and he began delivering the ASP pages component of the Spottraffic software directly to Transmedia's servers via remote access to those servers.  *Id*.  The ASP pages were fully delivered by the end of 2001, and in 2002, Adams asked Yates to extend his coding services "to include coding for the

3

FTP Downloader and to revise the ASP pages" as necessary to operate in conjunction with the new Downloader. *Id*. ¶¶ 9-10.  Revisions to the ASP pages by Yates were again delivered directly to the Transmedia server. *Id*. ¶ 12.  For his coding work in the October 2001 to July 2005 period for the ASP pages and the Downloader aspects of the Spottraffic package, Yates was paid $54,300.00.  *Id*. ¶ 13.

Yates himself "participated in the installation of the Downloader component of the Spottraffic software at several TV stations from 2003 to 2005, including installations at KRON in San Francisco, Comcast, and CABC in Los Angeles." *Id*. ¶ 15.  When issues arose, Yates would often personally be involved in troubleshooting those issues at specific broadcasters on behalf of Transmedia.  *Id*.  Adams declares that from his "first meeting with Mr. Yates in 2001 through the entire course of Transmedia's working relationship with him, Mr. Yates had never proposed or requested any agreement, written or otherwise, specifying that use of the software he delivered to Transmedia, including the ASP pages, was conditioned upon his continued involvement with or employment by Transmedia, or was otherwise subject to any further expression of permission for use, or payment of any royalty or other compensation beyond what was agreed upon in 2001 and what he invoiced Transmedia, which invoices were paid in full." *Id*. ¶ 19.  Yates did not claim rights to the software -- or assert a need for Transmedia and its clients to have Yates' permission for continued use of it -- until 2009, "soon after Transmedia discontinued use of Yates' services." *Id*. ¶ 18.  In 2014, Adams learned that Yates had registered a copyright for the ASP pages component of the Spottraffic software, "specifically 22 separate ASP files, five of which Yates had labeled . . . :  'Created for Transmedia by Peter Yates 09/26/01.'" *Id*. ¶ 24.

These facts collectively establish an objective intent on Yates' part, at the time he created and delivered the software, for defendants to use, retain and modify that software.  Yates' effort to create a genuine dispute of material fact over these issues is unsuccessful.  Yates repeatedly focuses on the length of relationship here, explaining that he and Adams "had a long term and ongoing relationship" which spanned from 2001 until 2009.  Dkt. No. 65 at 10-11.  But here, as in *Asset Marketing*, the "ongoing service relationship" in which Yates provided technical support for defendants and "created certain custom software applications" at their request ultimately indicates

4

"neither an intent to grant nor deny a license without [Yates'] future involvement." 542 F.3d at 756.

Significantly, Yates points only to his own subjective intentions, which are not relevant in this analysis. *See*, *e.g.*, Dkt. No. 65-1 ¶ 13 ("Prior to my services being terminated, my understanding and intent was that no license for the software was needed, or required, because I anticipated participation in future projects with defendant Adams and Transmedia."), *and compare with Asset Marketing*, 542 F.3d at 756 ("The relevant intent is the licensor's objective intent . . . as manifested by the parties' conduct."). Where Yates does refer to external communications, he gets the time period wrong. *See* Dkt. No. 65 ¶ 15 ("Once Transmedia, and thereby, defendant Adams communicated to me that no further participation would occur, I immediately notified defendant Adams that I was asserting my exclusive license of the software."), *and compare with Asset Marketing*, 542 F.3d at 756 (relevant intent is the "licensor's objective intent *at the time of the creation and delivery of the software*") (emphasis added). On the latter point, the *Asset Marketing* court found that an implied license existed after considering the fact that the independent contractor and company "did not discuss a licensing agreement until their relationship was ending. Gagnon delivered the software without any caveats or limitations on AMS's use of the programs." *Id.* at 757. "The first time Gagnon expressed a contrary intent was in his letter to Akersent *after* AMS had decided to terminate Gagnon's services." *Id.* (emphasis in original). Those same observations fit this case to a tee, and the same conclusion applies: Yates granted Adams and Transmedia's clients an implied, nonexclusive license.

Yates argues in the alternative that the implied license was revocable, and that he in fact revoked it. Dkt. No. 65 at 13. But that argument also fails. In *Asset Marketing*, our circuit held that where consideration is paid, an implied license is irrevocable. 542 F.3d at 757 ("If an implied license accompanied by consideration were revocable at will, the contract would be illusory."). Yates tries to escape that conclusion by arguing any compensation he received was only for his labor, and not for the software itself, *see* Dkt. No. 65 at 7, but that argument has been tried and rejected before. *See*, *e.g.*, *Asset Marketing*, 542 F.3d at 756-57 (where he was well paid for his services, "it defies logic that AMS would have paid Gagnon for his programming services if AMS

5

could not have used the programs without further payment pursuant to a separate licensing arrangement that was never mentioned in the TSA, and never otherwise requested at the time."); *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990) ("To hold that Effects did not at the same time [as creating a work at defendant's request and handing it over to defendant] convey a license to use the footage . . . would mean that plaintiff's contribution to the film was 'of minimal value,' a conclusion that can't be squared with the fact that Cohen paid Effects almost $56,000 for this footage."). Yates has himself submitted his invoices for his programming work that total in the tens of thousands of dollars. Dkt. No. 65-1, Exh. 1. These were for his work on "custom software [that] is far less valuable without the ability to modify it." *Asset Marketing*, 542 F.3d at 757. The argument that he was paid only for his labor does not hold water.

In sum, the conclusion reached in *Asset Marketing*, 542 F.3d at 757, applies equally here: Yates "had to express an intent to retain control over the programs and limit [defendants'] license if he intended to do so. A belated statement that the programs could not be used after [Yates'] departure, made after the termination decision and well after the creation and delivery of the programs for which substantial sums were paid, was not sufficient to negate all other objective manifestations of intent to grant [defendants] an unlimited license."

## CONCLUSION

Yates granted to defendants an implied, nonexclusive, irrevocable license, and that defeats his copyright infringement claim against them. Defendants' summary judgment motion is granted. Dkt. No. 61. Judgment will be entered for defendants and the Clerk will close the file.

**IT IS SO ORDERED.**

Dated: March 1, 2017

JAMES DONATO
United States District Judge